JOSEPH KIRBY and MARIA E. his wife,

v.

ARCHIBALD TURNER, JOHN THOMSON, JOHN TAYLOR, JOHN MOWAT JUNIOR, WILLIAM DUNLAP and RACHEL DUNLAP.

Where there are several guardians of an infant's estate, they may act either separately or in conjunction. They are jointly responsible for joint acts; and each is separately answerable for his separate acts and defaults.

Such guardians having, with a surety, given a joint and several bond for faithful performance, their rights and duties as guardians, are not thereby varied.

They are not, by such bond, made sureties for each other.

But the surety is liable for their joint defaults, and for the separate defaults of each.

In construing such bond the penalty and condition are to be taken together; and the words jointly and severally, though in the penalty only, will operate throughout; and they are to be taken distributively, according to the nature of the cases; in which defaults may occur.

Where there are several guardians, the statute requiring the surrogate upon the appointment of guardians to take from every guardian, a bond with surety, &c. is complied with, by taking one joint and several bond from all the guardians, with surety.

The statute did not intend to place joint guardians in the relation of sureties for each other.

In this case, the ward after full age, gave a separate release to T. one of her guardians, who had not her property in possession, reserving her right against A. T. another guardian, who had wasted it. Held, that the release is a discharge in favor of T. and of the surety, so far as T. is concerned.

But the release is not available in favor of A. T.; and the surety still remains liable for A. T.'s defaults.

The release has the same construction in regard to sureties, as in regard to principals.

The maxim of the common law, that a release of one joint debtor is a release of all, is not applicable to cases of joint trusts, where the party released was not in default.

In this case, the suit was dismissed with costs against the guardian T. who was released, and also against the representatives of D. another guardian who had never acted: both A. T. and the surety were declared to be liable for the amount of property received and wasted by A. T.; and an account was directed.

JOHN TURNER junior, of New York, merchant, died in 1801; having first made his will, of which he appointed his wife Christiana, and James Dunlap, now deceased, and the defendant John Thomson, executors; and leaving children, to wit, the defendant Archibald and the complainant Maria E. then both infants. Christiana the widow died soon afterwards, leaving the same children, her heirs; and Dunlap and Thomson proved the will. Archibald Turner came of age in 1803; at which time Maria was about six years old; and in

1823.
19th, 20th, 21st November.
1824.
30th October.
1st, 2d, 3d, 4th November.

*Surety on guardians's bond.*

*Release.*

*Account a-gainst guardi-ans.*

40

1806, Dunlap, Thomson and Archibald Turner were appointed guardians of Maria, by an order of the surrogate of New York; and they, together with the defendant John Taylor, executed to the infant ward, a joint and several bond in the penalty of twenty four thousand dollars, with condition that the guardians should faithfully discharge their duty as such according to law, and render a just account of such guardianship, to any court having cognizance, when required.

In 1807, Dunlap and Thomson, or one of them, made a division of the personal effects of the testator, and transferred to Archibald, in his own right, the amount of sixteen thousand one hundred and seventy two dollars and eighty five cents, and also to him, as guardian of his sister, a like sum.

The testator died seized also of a valuable real estate, the rents and profits of which from the 1st of May, 1806, to the 1st of November, 1817, were charged by the bill to have been received by Archibald, amounting to twenty one thousand seven hundred dollars; of which rents and profits the complainant Maria was entitled to a moiety.

Dunlap died in 1809, intestate; and the defendants Rachel Dunlap, John Mowatt Junior, and William Dunlap are his administrators.

Maria came of age the 25th of November, 1817.

The remaining facts in this cause are more or less doubtful, or litigated; and are stated by way of reference to the allegations of the parties, or to the testimony.

The bill charged, that in June, 1818, the defendant Thomson handed to Maria a bundle of papers, which he said contained the accounts of the guardianship, with deeds, &c.; and at the same time, presented her a paper, which he said was a release to him individually, requesting her to sign it; as he represented that he had faithfully executed his trust: that she, from the full confidence she reposed in him, executed a paper, purporting to be a release to Thomson, without opening the bundle of papers, and without examination; being also without counsel or any person to advise her, and ignorant, not only that the bond was joint and several, but also that the guardians had given any security: that when she came to

1824.

KIRBY
v.
TURNER.

open the bundle of papers, she found it contained various deeds, loose receipts, &c., but no account, nor the materials out of which to make one : that the whole amount of property received by her from her guardians, is, by them estimated at only about nineteen thousand dollars; whereas her share of personal property with interest, would amount to about twenty six thousand dollars, and the rents of her real property to more than ten thousand dollars.

The bill prays an account ; and that the defendants may be decreed to pay the balance that may be found, notwithstanding the release ; and that the said release may be deemed to have been improperly obtained, and to be given up and cancelled.

The defendant Thomson, in his answer, stated that Archibald, being independent in his circumstances, and the only brother of Maria, took upon himself solely the guardianship, and was the sole acting guardian, and that he Thomson, never, alone, or with the others, intermeddled with, or received any of her estate ; and that he and Dunlap, as executors, and not in any other character, became possessed of the personal estate, and being desirous to close the concern, submitted their accounts to the said Archibald, who examined the same and approved thereof: that they delivered over the estate, in substance as mentioned in the bill, on the 20th of August, 1807 : says that all the property they held was received, held and delivered over, as executors, and not as guardians ; and that after that delivery he never had in hand any property of Maria : admits that Archibald, who was also a tenant in common with Maria, received her rents as guardian : says that Archibald continued in good circumstances, till he met with losses in 1817 ; that Maria, shortly before she came of age, applied to this defendant as her friend in relation to the affairs of her brother ; to which from benevolent motives, though much advanced in years, he applied his attention, and obtained several deeds of property, which her brother willingly conveyed to secure her estate, amounting in all to nearly twenty three thousand dollars, and which were made about the time she came of age, and that the papers were left in the hands of counsel, until he obtained and

delivered them to her : that Maria, as well before, as after she came of age, was fully and minutely acquainted with the circumstances of the property and its valuation, and repeatedly after she came of age expressed her entire assent, and her gratitude to defendant : that she repeatedly told him, that she knew he never had received any part of her estate, nor acted as her guardian, and ought not to be liable on the bond ; and that she was perfectly willing to release him from all liability, and never intended to call on her brother, and was willing to release him also ; but as his wife had not joined in the conveyances to relinquish her right of dower, she would retain the apparent liability to obtain that object; and that she *freely offered to execute to defendant* a full release of all liability by reason of the bond ; reserving only her right to look to her brother, for the purpose aforesaid : that in June, 1808, the defendant, at the request of Maria, called on the counsel and obtained the papers, together with Archibald Turner's receipt, which had been prepared with the papers and left with them, and he left those papers with Maria for examination ; and also at the same time left with her a release to be executed by her, if she thought proper : that he called the next day, when she carefully compared the papers one by one with the receipt, and delivered to defendant the receipt, which has since remained with him and which he sets out. The receipt states the property received and concludes " and that " I have received the same on account of my demand against " A. Turner as guardian." This receipt was dated the 28th of November, 1817 ; and witnessed by Cornelia Huie. He says that she also, at the same time, executed and delivered to him under her hand and seal a release, in the words following :

" I do hereby acknowledge that Mr. John Thomson, one of " my guardians, hath fully settled and accounted with me " for any claims or demands I have against him as such " guardian ; and I do hereby fully release and discharge him " of and from all claims and demands whatsoever which I " have, or can in any wise claim against him from the be- " ginning of the world to the day of the date hereof; but this " release is not to apply to, or affect, my claims against my " brother Archibald Turner, who has been my acting guardi-

" an, and with whom as such, my account remains unsettled.
" Witness my hand and seal the 5th of June 1818.
" MARIA ELIZA TURNER.
" Sealed and delivered in the presence of Cornelia Huie."

The defendant further says, that she executed the release freely, without any persuasion, and professing that she did it from a sense of justice, to relieve him from all liability on account of her brother, he never having acted as her guardian, nor received any portion of her estate. He denies all concealment, and all persuasion, and improper circumstances to induce her to execute the release, and all fraud and misrepresentation ; and denies that he left the bundle of papers as containing his account as guardian, since he had never acted as such ; and denies that the papers were delivered to her upon any condition that she should execute the release, and she knew on the contrary, that the papers had been executed for her use : says that the deeds had been recorded, and she had taken possession of the property.

The answer of Archibald Turner coincided in general, with that of Thomson.

The representatives of Dunlap, in their answer, denied that to their knowledge or belief, he had taken upon himself the execution of the will, though he proved it, or that he received any of the property ; and they allege their belief that Thomson alone received the property, and made the division of it between the two children of the testator. They insisted, that Miss Turner by executing the release, did intend to discharge all other persons except her brother, and they set up the release as their defence, with the same averments as those made by Thomson.

The defendant John Taylor, at first pleaded the release, with averments that it was executed by the said Maria, of her free will, without persuasion, with full intent to discharge Thomson ; and that it is also a full discharge to this defendant as surety. This plea was supported by an answer, insisting on the same matter, and containing the same averments generally, as that of Thomson.

This plea was set down for argument, and allowed by the late chancellor Kent ; who on the 1st of August, 1821, thereupon dismissed the complainant's bill, as against Taylor.

1824.

KIRBY
v.
TURNER.

A rehearing was afterwards granted, upon which the late chancellor varied his former decree, and allowed the plea so far only, as it goes to protect Taylor, as surety for Thomson, on the bond against all responsibilities to which he Thomson might have been liable on the bond, prior to the release. The former decree, dismissing the bill as against him, was therefore reversed, and the plea was directed to stand for an answer with liberty to put in a further answer. See 6 John. ch. 242.

The defendant John Taylor then put in his further answer, insisting that when he became surety, Thomson and Dunlap were merchants of long standing, great property, and known integrity, and that they, and particularly Thomson, had in, their hands the property of Maria, and that it was from his confidence in them, that he became surety, which he should not have done for Archibald separately; nor would he have become surety for them jointly, except upon the knowledge that Thomson and Dunlap had the possession of the property; that he had recently been informed of the delivery of the property to Archibald; and he insists that the same was so done on the personal undertaking of Archibald, and sets forth the receipt which he gave for the property: that this arrangement was made without his knowledge, and he insists, that all the guardians, and the estate of Dunlap, continued jointly liable with Turner, and that Thomson remains liable to indemnify the defendant; that Archibald Turner continued in good circumstances, till shortly before Maria came of age, when he became insolvent, in consequence of indorsements for the Dunlaps. This answer agrees in its statements generally, with the others. This defendant insists on his former plea, and asks the benefit of it, as a discharge to him, the surety.

The cause being put at issue, witnesses were examined. The execution of the release was proved by the subscribing witness, a young lady who was a relative of Miss Turner, and lived in the same family with her, then, and afterwards till her marriage. As far as she saw or knew, there was no persuasion, &c. to induce Miss Turner to execute the release. She had before told witness, that she was going to release Mr. Thomson from his guardianship. and she never after, and

before her marriage, expressed any dissatisfaction respecting the release. Witness saw no other papers delivered her at the time. See 6 John. ch. 79. 242,

MR. JONES and MR. DUER for the complainants.

This is a bill by a ward against her guardians and their surety, for a deficiency in her estate. The bond becomes a necessary ingredient to bring the surety before the court.

The release is void in equity. The history of it begins in 1817, when Miss Turner came of age, and when she was living with her brother, who had spent her property, and who then first disclosed to her his insolvency. But he told her nothing of the bond. Thomson and the brother made over property to her at their own valuations. The deeds even remain with their counsel, not hers; and there is no proof of her going into possession. This is done before her full age; without accounts rendered; and she gets no property till she makes the release. She neither understood the transactions, nor her rights. She intended to discharge Thomson only.

Here is no acquiescence nor undue delay. She married within a few months; and her husband soon after took counsel, and commenced this suit.

The release is void in equity, on the general ground of public policy. Therefore, no averment of fraud is necessary in the bill.

The relations of guardian and ward, and attorney and client, create an influence which is not the subject of measurement or proof. This applies more particularly to the guardian of a female orphan.

In these cases it is never necessary to show fraud. A case is cited in 1 P. W. 118, which exemplifies this rule; and the principal case there, that of the duke of Hamilton v. lord Mohun, goes the whole length of the one now in judgment. The release, though fair was set aside after twenty years, and after the death of the ward, on the ground of public policy. The terms of the lord chancellor's decree show, that he put it expressly on that ground. See also 1 Vez. 318. 380, where that is asserted to be the principle of the case.

In Hylton v. Hylton, 2 Vez. 547, an annuity granted to a guardian on giving up papers, though eighteen months after

the ward came of age, was set aside, " it being unnecessary " to prove imposition." It is compared to grants by young heirs which are set aside " although in a particular case there " may be fairness." And the lord chancellor says " on that " ground I went ; though undoubtedly, if in full possession, " after he comes of age, and is sui juris, and at liberty, he " chooses to give any reasonable reward for care and trouble, " when done with eyes open, the court could never set that " aside." Ib. 549. There is no absolute limit of time for the operation of this rule. The law guards the ward always " till accounts settled."

Now this release was given by Miss Turner, on the delivering up to her, of property and securities which she never had before, and without accounts ; and the arrangement was made before she came of age.

In 6 Ves. 266, the court disregards the fraud and disability and puts the relief on the relation of attorney and client. See p. 272. In Wells v. Middleton, 1 Cox. 112, so much commented on by the other side, the court say in terms, that they put it on the general ground of policy. The circumstances now alleged were not the real ground of the decision. The cases 9 Ves. 292. 12 Ves. 372. 13 Ves. 136 came under the like principle.

It will be argued against us, that the rule applies to gifts only, and not to releases. In principle where is the difference, whether the guardian, having money in hand is allowed to keep it, or not having any, it is given to him ? The release is even the more objectionable measure ; for she knows not the amount it may cover.

The opinion of the late chancellor upon the argument of the plea in this cause, is cited against us.

But first, that opinion also was, that the release was operative in favor of Thomson only : next, it stood then upon bill and plea only ; and the plea contained averments which are not proved now ; such as that the release was given upon full settlement and investigation of accounts, &c. &c. And the chancellor put all upon the plea, and said it was prima facie good, as being supported by those averments ; and he

could not then know, what now appears, that Thomson falls within the very exceptions which his opinion implied.

We contend, that even if the release is available for Thomson, it exonerates Taylor so far only as regards him, and only for his acts as guardian. As surety, Taylor remains liable for the others.

The bill insists on four grounds for avoiding the release : that it was executed in confidence in Thomson's statements ; in ignorance of her rights; without counsel; and without accounts rendered. These grounds are either not denied at all, or only so feebly and imperfectly, as not to make a defence ; and the detail of facts admits the charges, to a great extent.

The burden of proof to support this release rests on the defendants. They set it up. They hold the affirmative ; and must take upon themselves to show it pure.

If not void on grounds of public policy merely, there are circumstances coupled with it in this case, sufficient to avoid a release, as between guardian and ward, although the same circumstances would not have that effect, between other parties. These are the facts alleged in the bill.

For even if there was no studied concealment of facts, yet, if in truth, she was not fully informed of her rights, that avoids the deed. Ignorance of law is not proveable on her part. They should therefore show affirmatively that she understood her rights. If there was any thing known to the releasee, which he did not impart to the releasor, that avoids it. This is clear equity. The contract is unequal ; and equity will not endure it; not even if freely offered.

In 1 P. W. 239, a devisee under a defective will, obtained a release from the heir. This might have been innocent, and one of the witnesses so testified. But it was set aside. The present case is not stronger. The case in Mosely 364, is another example of the same principle.

How far ignorance of law will excuse in civil cases, is considered on the other side, as a general and single question. But it may admit of distinctions. Their first class of cases is for money had and received ; which, being an equitable action, is affected by that consideration. So, if not strictly allowed

at law, as to the making of contracts, it may still prevail in equity, as to the rescinding of them.

It applies in equity as well as at law; 4 Vin. Ab. 387. 1 Mad. 60. Fonblanque confirms the case in Viner.

If indeed a party comes to modify a bond on such proof, it may be liable to the objection that it rests on parol. But here we come not to modify, but to set aside, on ignorance of the law appearing from all the facts. And the release does not touch the bond; it is only from the guardianship of Thomson: the suretyship on the bond remains unaffected, whether by the terms, or the intent, of the release.

The case of Pusey v. Desbouvrie, 3 P. W. 315, was almost exactly like the present. An orphan under the custom of London released her share, without first having an account; and that release was set aside, on the single ground of her ignorance that she was entitled to have an account. See also 1 Vez. 507. 2 Vez. 310. 2 Mer. 354. The case in 1 Eden, 64, is very applicable to the present. It fully establishes the position, that he who sets up a release, must prove an account rendered, as an ingredient. A similar duty was required of the attorney in 6 Ves. 266, and the onus of proving it performed was cast upon him.

Here the defendants would hold the affirmative, if an issue were directed to try the points, on which the sufficiency of the release must depend.

The defendants allege however, that they have made out the affirmative. But the testimony of Miss Huie is given under a mistake, and the answers of the defendants are but to information or belief, except the answer of Archibald Turner.

Is that answer testimony for the other defendants?

The general rule has been received, that the answer of one defendant is not available for, or against, the other. The principle is fundamental, because the other defendant can not introduce testimony to counteract it; and also because the defendant who has answered might not be a competent witness, though necessary, as a defendant. As to the case in 1 Dick. the one answer referred to the other, and so made it a part; and it was to support a plea.

The case from 10 John. does not make out the point. Stanley was not examined to make out Clasons's defence. The question there was, as to the effect of the defence, when made out. Can you, at law, offer the default of one party, as proof against the other ? And even in that case it was finally decided, that Clason was entitled to but half the subject.

The release contains a recital which is false upon the face of it. " I hereby acknowledge that J. Thomson, one of my " guardians, hath fully settled with me for any claims I have " against him as guardian." This is to be deemed his recital ; but it is contradicted by his answer, that he never had any property as guardian, and never made any settlement. And yet, Taylor the other defendant admits that Thomson did receive the property, and did pass it over. Then the release contains a direct misrepresentation of facts, which destroys it.

If however the release can have any operation, it is available to Thomson only, and to him as guardian only. Releases, even of all claims and demands, are to be construed with reference to the subject matter, and confined to it. 6 John. ch. 242. And all the books are full to that point. If otherwise, such a release might be a bar to private bonds.

So also a release is to be controlled in its operation by the recital. 1 Vez. 507. 2 Ib. 310. 16 John. 115. 1 Lev. 101.

Then it did not extend to the bond, but only to the guardianship. The bond is not mentioned. The term guardian limits it. Neither is there any consideration beyond Thomson's settlement, as guardian.

That a release to one coobligor discharges all, is a rule which applies when all are principals, and when the debt of one, is the debt of all. But if one is a surety, the rule does not apply : and we may produce parol evidence that he is surety only.

Suppose the release not to apply to the bond in terms, and an action brought on the bond, assigning a breach ; and suppose the matter of that breach is covered by the release, which is pleaded in answer to it. Here the bond is preserved, but the action defeated, by the release. And thus Thomson would be protected, though the others might remain liable.

Neither does the exception of Archibald Turner's liability, made in the release, imply an intention to discharge all the others.

The release is to Thomson singly, as guardian. But while Miss Turner reserved her claims against her brother, she could not intend to release his surety. She could not do two irreconcileable things.

The bond is collateral. The duty arises from the appointment as guardian, and the acceptance of the trust. The release is of all claims and demands; but reserves her claims against her brother. Then, to whatever extent the general terms of the release would have included the bond, to that extent, the reservation excepts it.

But this reservation of her claims against her brother is in the nature of a condition precedent, and must be literally complied with. It was to preserve his responsibility. Then the release can never so operate, as to destroy the reservation. The intent must be preserved : and if the intent of the reservation can not otherwise be preserved, the release must fail.

The true and sound construction is however, that it shall apply only to separate demands against Thomson; and that as to joint liabilities, it should not avail. Such seem to have been the views of the late chancellor on the natural equity of the case, without regarding the terms of the reservation. 6 John. 250.

The bond neither increases nor diminishes the duty of the guardians, but is collateral to it. So the three guardians are all principals. Therefore equity, to which the party must always come for the account, will never treat them as sureties for each other. If not so, how would be the case, if an obligor should die before receiving any of the funds? Or could the others go on indefinitely, and ruin his estate, by their defaults? It must then be construed in equity, according to the intent of the act, and the trust and duty of the guardians; and not the mere terms of the bond. On any other construction, there can never be a settlement with any one joint guardian. The principals are not sureties for each other; but the surety is bound for all the principals.

It is argued against us, that the release shall be taken most strongly against the releasor. Ever since the time of Little-

ton it has been held, that a release may be on condition, and even subject to a defeasance. The principles are arranged and collected in Shep. Touch. 320. 323. 342, 3. A release, operating by way of mitter le droit, and on condition, makes that condition, in its nature precedent. The condition would be gone, unless it were precedent. Then the release can have no effect, but subject to it. So the present release saves the bond. But it operates according to its intent, in favor of Thomson, for his defence against all breaches of the bond committed by him.

Thomson then, not being bound as cosurety, Taylor can have no recourse on him. Taylor's liability for Turner's defaults continues, but with without recourse. With respect to Thomson's default, it is discharged.

Was then Thomson liable as guardian, in consequence of delivering the funds in his hands to Turner, his coguardian? This question is somewhat doubtful, on authority. In the time of Littleton, the guardian was held not liable. In later times, the point has been held otherwise.

The representatives of Dunlap contend, that the delivering over of the property was made by Thomson as executor. So we think it was: the papers are all so expressed, nor is it any objection, that the property of the deceased mother was delivered over with the rest. It was undistributed; they still held as executors; and must so hold till distribution made.

But suppose that Thomson was and continued liable: is he not so at the election of the ward only? and does it give any right to the surety to stand in his place? Suppose she chooses to call, not upon Thomson, but upon Turner, the actual defaulter; and upon Taylor, as his surety? Can Taylor then proceed against Thomson on the ground, that she could have done so? We doubt this, as against an obligor who is not liable as a cosurety. It stands as if each surety had given a separate bond.

Suppose that Thomson was liable, either as cosurety, or as guardian; that he is released; and that Taylor as surety, avails himself of that release. But the release can only enure to the benefit of Taylor, if good in favor of Thomson. Then if it be true, that Thomson was liable for any thing, the

release is void for the misrepresentation and concealment; and if it fails as to Thomson, it fails as to Taylor also.

Taylor puts it on the ground that Thomson was liable, and the release goes on that ground also. But if liable, did Miss Turner so understand it? Then it is void either way.

It is said there is no equity against a surety. We seek none: we ask only the effect of the bond at law; not to set up here a bond, which at law would be void. We came here from necessity only, for the account. Even if the court agree in our construction, it is not an equity.

But the rule is not so; there is equity against a surety: as in Radclif v. Graves, 1 Vern. 196. to establish a probate bond which was got up by fraud. " In many cases," says the lord chancellor, 3 Atk, 91. " and it is much stronger if " the principal procure the bond to be cancelled, by fraud." So in Prec. in ch. 309. 2 Caines Error 57. And in Law's case in 4 Ves. the decree was in his favor, only upon his giving security to repay.

MR. CHARLES BALDWIN, for the representatives of Dunlap.

In 1807, when Archibald Turner came of age, the share of his sister, as well as his own, was delivered over to him. We say this was the act of Thomson only. It will be alleged against us, that our testator acted jointly with him. But Dunlap never acted either as guardian or executor; proving the will does not make him liable in the latter capacity.

It is true, that a receipt to both Thomson and Dunlap, is produced; but it is produced by a codefendant; we could not cross examine to it; it is no way proved to have been concurred in by Dunlap. Why should both have possession of the property? Besides, it is only as guardian, that the bill charges us. Thomson alone received the property, and he both received and delivered it over, as executor, not as guardian. Joint receipts to them, for conformity, do not make the persons named jointly liable. 2 D. & E. 366. 2 Ves. jun. 678. 4 Ves. 596. 608. 622. 5 Ves. 331. 1 P. W. 83.

These are joint trusts. Either they survive, and then we are discharged by the death of our testator, or death is itself a revocation. 3 John. ca. 53. The trust as guardian may survive, and the surety be liable for the survivors; but the es-

tate of Dunlap would not be liable for the acts of the surviving guardians, and the bond for faithful performance becomes inoperative against the executors of Dunlap, if they do not interfere with the estate, nor take his place. There was no default during his life.

The duties of a guardian, whatever they are, exist antecedently to the bond, and independently of it; and they depend on the general principles of law. The case of testamentary guardians, who are not required to give bonds, still remains on that ground. Then the bond with surety, which the surrogate is required to take, 1 vol. revised laws, 454, upon his appointment of a guardian, imposes no new obligation on the principals, nor does it vary their relative rights. It adds suretyship and fixes the amount. But the liability must still depend on the reception of trust; and Dunlap never acted.

But if this is not so, the release will exonerate the estate of Dunlap. It was so decided by the late chancellor. There is no charge of fraud; none has been proved; and it rests on Thomson's answer, that Mrs. Kirby executed the release freely and understandingly. She was an intelligent woman and well understood the transactions; and Thomson had no influence over her, but the just influence of real kindness. He was not even guardian; for he never acted as such. And as executor he fully accounted. If this release can be set aside, either by reason of the nominal consideration, or for the other objections alleged, it would destroy half the releases in the nation.

Among the many cases which have been cited on the former argument, there is not one, where a court has set aside a release, on the ground of public policy merely. There never was a case, where a court set aside a release, merely because it was given by a ward, a client, or a cestui que trust, and merely because in such case, it was against public policy, unless in the particular case, there was fraud, falsehood, concealment, imposition, &c. The counsel here examined the cases cited to support the contrary doctrine, which, he insisted, can not be deduced from them.

If the rule is simply, that a ward coming of age can not execute a valid release to his guardian, and if this rule is inde-

1824.

KIRBY
v.
TURNER.

pendent of all questions of good or bad faith, then there must be a definite term fixed for the duration of the incapacity. What is that term ? If he can not release in six months, when can he ?

The release is absolute as to Thomson ; and Archibald Turner is excepted only because he had the property. If he had not held the property, the exception would have been inconsistent. In terms there was no exception as to Dunlap, who never had any of the estate in possession. But it must be availing in favor of Dunlap, or it will be nugatory as to Thomson ; for if a recovery is now had against my clients, they can come upon Thomson for contribution. A release to one therefore, extends to all, who are in the same condition of liability.

We are not called upon to discuss the question how this applies to Taylor, the surety. Probably, he ought to be discharged, on the same principles. The discharge of Thomson can not be effectual, unless it exonerates Taylor also ; otherwise Thomson would be made liable anew, by virtue of the contribution for Taylor's indemnity.

But in case Taylor should be held liable, will the court go on and decree against us by way of contribution in his favor ? We think not. We are now but codefendants with him. He should file a cross bill, and to that we may have other defences.

MR. SLOSSON for Thomson.

MR. EMMET for Taylor.

The defence of these two parties, so far as the validity of the release goes, was the same. Other considerations applying to Taylor alone, were discussed by Mr. Emmet more particularly. But to prevent repetition, we have attempted to bring both arguments together, under one head.

The validity of the release is established by the decree of 25 of November 1822, so far as it respects Thomson, and Taylor, as surety for Thomson.

By that decree, the plea was to stand for an answer, with liberty to answer farther. And having so answered, the defendants now insist, upon the new matter they have set up, that the release is a discharge in full. They may insist in the answer

upon the matter of a plea which has been overruled. Beam. pl. 321. 2 Vez. 492.

The release is a complete discharge of the bond, as to every party to it. The bond is merely collateral to the right of action, which arises not on the bond itself, but on the acts of the guardian : and no action lies on the bond, until an account has been taken and settled. 19 John. 304. 1 John. ch. 607.

A joint or a joint and several bond creates but one duty ; and a release to one coobligor is a discharge to all parties from that duty. 1 Bos. & Pul. 630. Co. Lit. 232. a. and note, 1. 2 Saund. 48. a. Hob. 66. 70. 7 John. 209. 210. 8 D. & E. 168. It is so in equity as well as at law. 1 Atk. 294. And the reservation of a right to an account against the acting guardian, is not inconsistent with this idea, because the bond is collateral.

The reservation is precisely confined to him, as acting guardian ; meaning for his receipts ; and the right so reserved, is widely different from the joint demand, which at her election, she might have pursued against all.

The bond is not the foundation of the claim against Turner, as seems to have been incautiously admitted by the late chancellor. 6 John. ch. 253.

The trust indeed may be decreed against all, who as guardians, are liable in that sense. But it is not possible, that on the bond some can be held, while others are discharged. The question of contribution as between themselves, is quite different ; but as respects the obligee, it is one duty only.

Here are three persons who in 1806, became guardians of Miss Turner. Two of them had been executors of her father's estate before ; and as executors, they took a receipt for the property when delivered over. That delivery was equivalent to a distribution, and from that time, the property is held, by some or all, as guardians.

By Taylor's answer it appears, that he signed the bonds, from personal confidence in Thomson and Dunlap. Shall they then be allowed to transfer the trust to another hand, and make him liable for a person, in whom he had no confidence, and for whom he never would have become surety ? The act

42

of delivering over the property to Archibald Turner, fixed their liability. The executors of Dunlap seek to be withdrawn from this responsibility ; but their denial is not of their own knowledge, and it is weakened by the assertions of their codefendants ; who insist that he did act. Besides, acts were done in which he must have concurred, such as transferring stock, and the assignment of bonds and mortgages.

There is no motive for directing a cross bill ; all is before the court.

Every release is prima facie good ; even if assailed on the ground of public policy, a foundation of fact must be laid for it, and that is attempted in this case. They allege, that the release was within six months after she came of age ; that it was signed in confidence when without counsel ; and that there was no account rendered in 1807, though the mention of that date leaves open a strong implication, that an account was rendered at another time.

Not only must these facts be averred ; they must be proved also. It is also to be taken into consideration that Miss Turner lived unmarried a year after these transactions, and manifested the most perfect satisfaction with them. It is only since she is sub potestate viri, that she sues.

The answer of the defendants deny every material allegation of the bill, as fully as the nature of the case admits, and so fully, as to put the complainants on proof.

Again ; the answer of each defendant must avail the codefendants by way of denial to put him on proof ; and in this way, every allegation is most abundantly denied. 1 Dick. 130. In Clason v. Morris, 10 John. 525, the bill was against Clason and Stanley. Stanley suffered the bill to be taken pro confesso ; and Clason answered and disproved it ; and the whole court, agreeing in opinion with Spencer, ch. j. decided, that no decree could be made against Stanley. And in every case of a joint demand, the defence of each, and therefore the answer of each, must avail in favor of the other. If either is discharged, the other must be also.

All that is alleged about Miss Turner's ignorance of facts is rebutted. Her ignorance of the law is also denied.

It has been much discussed whether the rule " ignorantia
" juris non excusat," is confined to criminal cases only, or
whether it applies to acts regarding civil rights ; and the bet-
ter opinion certainly is that it applies in the latter case. Mosely
364. 3 P. W. 310. 1 Selw. N. P. 80. It was so consider-
ed by Kent ch. j. in 2 John. R. 157. who cites 2 East, 469.
and Buller's opinion in Doug. 468. 471. and Doct. & Stud.
12 East, 38. In 5 Taunt. 143, it was ruled by three judges
against the opinion of Chambre J., that money innocently paid
on an illegal transaction, can not be recovered back.

But here, no foundation is laid for the application of the
rule. Miss Turner knew of the defalcation, and she also knew
her rights, for she reserved them as against Archibald Turner.
And she had and has a distinct right of action against him,
even if there were no bond. She may prosecute on the re-
ceipt he gave to the executors for the fourteen thousand seven
hundred and sixty seven dollars, for which he promised them
to account with her, when she should come of age ; that be-
ing a promise for her benefit. 1 Boss. & P. 101. note b.
Or she may sue him on the mere fact of his having her money
in his hands : she may even recover it in this very suit. The
release puts her in no worse situation in that respect, as it dis-
charges none but joint causes of action ; as to which a re-
lease to one is a release of all. Lord Ray. 420. 7 John.
207. 1 Atk. 294. Co. Lit. 232, in note, 144. 2 Saund.
48. a. Fonb. Eq. book 1, ch. 2. sec. 7, note 6. 1 Mad.
ch. 60.

And in case of release to one joint coobligor, " the obliga-
" tion is extinguished, and though it is most apparent that
" such was not the intention of the obligee, yet equity will
" not relieve." Per Washington, J. 1 Pet. R. 301 and 307.

No act by a ward coming of age has ever yet been set aside,
on the mere ground of public policy, without default or mis-
conduct ; or unless it was an act of bounty ; something be-
stowed ; but never if it were a release of demands only. The
cases 1 P. W. 118. 2 Vez. 547. 260. 1 Vez. 380. 6
Ves. 266. 9 Ves. 292. justify this distinction.

The case of Welles v. Middleton, in 1 Cox, 112, is no ex-
ception to this rule, though lord Erskine has thought other-

1824.

KIRBY
v.
TURNER.

wise, and has said that it went on the ground of public policy only, clear of fraud. 13 Ves. 52. It is very singular that though this case is often cited, the report of it in 4 Bro. P. C. 245, should be wholly overlooked by lord Erskine. From that report it appears to have been a case of flagrant fraud. The cases in 13 Ves. 136. Swanst. 137. 1 Eden, 66, all turn upon the same principle.

So far we have considered our client Taylor as a joint obligor. But he is a surety; and no misconduct of the party obtaining the discharge can affect him: not even if the discharge was obtained by error, or by fraud and covin. 4 Ves. 824. 1 Vern. 196.

There is no equity against a surety.

The surety is always discharged, by any dealing with the principal whereby he may be prejudiced: that he may possibly be prejudiced is enough. 2 Ves. jun. 542. 17 John. 384.

Taylor is surety for Turner whose property is all assigned away. Mrs. Turner has released her right of dower upon certain concessions. Some notes also have been given over. In none of these respects, can Turner be placed in the same situation as before. And this difference of condition arises from transactions of the principal with him, in which the surety did not participate.

Again, if there was any remedy, it has been lost by time. During all the time in which this release has been in operation, Taylor has had no means of recourse upon Thomson, nor upon Turner. He could not call upon Thomson to render accounts, in his exoneration.

But if Taylor is at all liable, then both Thomson and Dunlap's estate must be held for his indemnification. 2 Bro. ch. 579. 10 John, 587. 3 Wills. 530, and Ludlow v. Simond, 2 Caines' Ca. in error, 1.

1825.
6th January.

THE CHANCELLOR. The object of this suit, is, to obtain satisfaction for certain parts of Maria E. Turner's estate, bequeathed to her by her father, John Turner junior, who died in 1801. Thomson and Dunlap were executors of the will of John Turner junior, and as executors, had his personal estate

in their possession. They and Archibald Turner, were appointed guardians of Miss Turner, in June 1806; and in August 1807, they delivered to Archibald Turner, Miss Turner's share of her father's personal property. The property which was thus delivered to Archibald Turner, has not been accounted for by him, in any manner, either to Miss Turner, after she attained legal age, or to the complainants, since their marriage. Archibald Turner as one of her guardians, also received the rents and income of her real estate, during her minority; and for the sums so received, he has likewise, failed to account.

In these circumstances, what were the rights of the ward against these guardians, or either of them? Were all the three guardians responsible to the ward or to the complainants; or was Archibald Turner alone, liable for the property of the ward, which he thus received? I now consider the case, without reference to the bond or the release.

Miss Turner's share of her father's personal estate now in question, was never in the possession of Thomson and Dunlap, as guardians. It was a part of the estate of her father, which at his death, passed into the hands of Thomson and Dunlap, as executors of his will. It was held by them as executors, until they delivered it to Archibald Turner, as one of the guardians of Miss Turner. Archibald Turner was the acting guardian of his sister; Thomson and Dunlap never acted as guardians of her estate; and Archibald Turner alone, had her property in his possession, after it had been delivered to him by Thomson and Dunlap. It is expressly alleged by Thomson, that the delivery of Miss Turner's share of her father's personal estate to Archibald Turner, was made by Thomson and Dunlap, as executors, and in no other character. The allegation of the representatives of Dunlap, is, that the delivery was made by Thomson as acting executor. Archibald Turner states this transaction in substance, as it is stated by Thomson. The receipts given for this property, were from Archibald Turner, as acting guardian, to Thomson and Dunlap, as executors. These statements and facts are not denied or disproved; and it must be taken as a fact, that the pro-

1824.

KIRBY
v.
TURNER.

perty in question, passed from Thomson and Dunlap, as executors, to Archibald Turner, as guardian.

This property was then delivered by Thomson and Dunlap to Archibald Turner, as it would have been delivered by any other persons, had it been held by others as executors ; and the receipt by Archibald Turner, was the act of one of the three guardians, who took into his sole possession, as guardian, the property of his ward. The delivery of this property by Thomson and Dunlap as executors, to Archibald Turner as guardian, was a measure free from objection. Some transfer from the executors to the guardians or some of them, was proper and necessary. Any one of the guardians was entitled to receive this property ; it was delivered to one of them ; the guardian who received it, was the acting guardian in other respects, and was then solvent and rich ; and there was at that time, not the least reason to doubt, that this property would be perfectly secure, in the possession of Archibald Turner. The delivery and the receipt took place in good faith, for the use of the ward ; and these acts exonerated Thomson and Dunlap as executors, and charged Archibald Turner, as guardian. Thomson and Dunlap then never had this property in their possession, as guardians ; Archibald Turner had it in his sole possession, as one of the guardians ; the failure to account for it to the complainants, has been the default of Archibald Turner, for which he is responsible ; and Thomson and the representatives of Dunlap, are not responsible for that default.

The rents and profits of the real estate of Miss Turner, were received by Archibald Turner alone. They might have been received by all or any of the guardians ; they were in fact, received by one of the guardians ; and the other guardians can not be responsible for this property, or for any misapplication of it, in which they had no agency.

The trust of these three guardians, was in its nature, joint and several. Their rights were equal ; their duty was divisible ; and they were authorised to act either separately, or in conjunction. They were jointly responsible, for joint acts ; and each of them was solely responsible, for his own acts and defaults, in which the others did not participate. Where

one of several guardians, acts alone and misapplies the property of his ward, or fails in any thing which is his several duty, he alone is responsible for his own misconduct. The failure here, to account for the property in question, has been wholly, the default of Archibald Turner; and Thomson and the representatives of Dunlap, can not be liable for this property.

Such would be the situation and rights of these parties, if no bond had been given. The bond taken by the surrogate, bound Archibald Turner, Thomson, Dunlap and Taylor, jointly and severally; and its condition was, that Archibald Turner, Thomson and Dunlap should in all things, faithfully discharge the duty of guardians of Miss Turner, according to law. The case which has occurred, is a loss of Miss Turner's property, by the default of one of the guardians. Are the two guardians, who independently of the bond, are not responsible for this default, rendered liable for it, by the bond?

The bond did not create the trust, or define its nature and powers; nor did the bond vary the obligations of the guardians. Their rights and duties are defined by law : and their duties were the same, after this bond had been given, as they would have been, had no bond existed. The bond in respect to the guardians themselves, bound them, according to their legal obligations ; rendering them jointly liable for joint acts, and each one severally, for his own acts. If the bond were considered, as making the guardians sureties for each other, in respect to the separate acts of each guardian, their responsibilities would be essentially altered and greatly extended. Joint guardians like joint executors or administrators, may very willingly undertake the trust proposed to them, when each one knows, that he is to be responsible only for acts in which he concurs ; while he would not become surety for the fidelity or the separate acts of his colleagues. The rules of law are not altered by this bond; nor do its terms import, that these guardians intended by it, to incur any engagement different from their legal responsibilities. This joint and several bond is easily susceptible of the distributive construction, which reconciles it with the rules of law, and holds the guardi-

ans liable jointly, in some cases, and severally, in others. The idea that all these guardians are bound for the several acts of each of them, is founded altogether, on the terms jointly and severally, used in the bond.  This bond is not for the payment of money, but for the performance of a trust, which is joint and several, in its nature.  The whole bond is one entire contract, of which the true sense is expressed in the condition.  All parts of the instrument, are to be taken together, in explanation of the sense and substance of the whole.  The words jointly and severally, must operate, not merely in the penal engagement of the bond, but also in its condition, and throughout the whole contract.  The guardians are bound jointly and severally, in one part of the bond, as they are bound in another; jointly and severally in the penalty, in the same sense and in the same cases, as in the condition; which is, to discharge their duty, according to the laws of this state.  The words jointly and severally, have proper force and effect, by referring them to the condition, as well as to the penalty of the bond, and by applying them distributively, to the different cases, in which a failure to perform the trust, may in respect to the different guardians, be a joint or a several breach of the condition.  The practice of taking security from guardians, is derived to us from the English chancery; and there, as in this court, it has never been supposed, that the security taken from joint guardians, involves suretyship for the separate acts of each other. Our law authorising surrogates to appoint guardians, requires, that the surrogate shall take from every guardian, a bond with condition, that such guardian shall faithfully discharge his duty.  If this direction were literally pursued, a bond would be taken from each guardian; but where all give a joint and several bond, it must have the effect of separate bonds, and must render all liable for their joint acts, and each one liable for his own separate acts.  Our statute did not intend, to place joint guardians, in the relation of sureties to each other.  Security to the ward, is an object provided for in another manner.  Every such bond is to be taken with sufficient surety; and he who becomes surety, is bound for the separate acts of each guardian as well as for the joint

acts of all.   The surrogates usually take one bond from joint
guardians or joint administrators ; considering the bond of
all as the bond of each one, and requiring a surety or sure-
ties, for the fidelity of all and each of the trustees.   This
practice is convenient ; and a construction of such a bond,
which should render the trustees sureties for the individual de-
faults of each other, would be as inconvenient, as it would be
foreign to the real intentions with which such bonds are exe-
cuted.   When joint guardians or joint administrators are ap-
pointed, one of them often becomes the acting trustee ; while
the others act not at all, or act only in particular instances.
This is frequently done with the best intentions ; the funds of
the trust, are received and held by the acting trustee ; and he
sometimes, wastes or misapplies the property.   It is repug-
nant to reason and justice, that the innocent trustees, who
have no part in the delinquency, should be answerable for it,
equally with the delinquent himself ; and still more is it so, as
loss does not follow, and full redress is provided by the secu-
rity which the delinquent has given for his own fidelity.
They are not responsible by our law ; and though they may
become sureties for each other, by express contract, such a re-
sponsibility is not created by the ordinary bonds given upon
their appointment.   Bonds from guardians appointed by the
surrogates, are required by statute ; are taken by public offi-
cers ; are given by all guardians, and always, with sufficient
surety to the ward.   These bonds are always meant to be such
bonds as the law requires.   A security thus required by a
statute, and intended by the officer who takes it and the par-
ties who give it, to be taken and given, in pursuance of the
statute, should operate according to the intention of the legis-
lature ; and the words used in the bond should be so con-
strued as to give effect to that intention.   If the terms of such
a bond are ambiguous or seemingly at variance with the ob-
ject of the law, they should be construed according to the in-
tention of the law, and should have effect, according to the
duties which the bond is meant to enforce.   The bond re-
quired by our law from guardians, was not intended to enlarge
their legal responsibilities ; or to bind all the guardians for
the separate delinquencies of one of them.   All the objects

43

of the law are attained, and the terms of a joint and several bond are satisfied, by the construction, that it renders the guardians jointly liable, where they act jointly, and severally responsible, for separate breaches of the trust. Such being the true sense and sound construction of this bond, it does not render Thomson and the representatives of Dunlap responsible, for the separate acts and defaults of Archibald Turner.

The complainants insist, that the release executed by Miss Turner to Thomson, is null, and should be treated as void, in equity. Upon this question, I concur entirely, with the late chancellor in his opinion, given in a former stage of this cause: 6 John. ch. 242. The facts and circumstances concerning the execution of this release, are now before me, more fully, than they were before the late chancellor, when he decided upon the bill and the plea and answer of Taylor; but the case is substantially, the same. The release was given by Miss Turner to Thomson, freely and voluntarily. It was given without fraud, coercion or surprise; without any donation of property, or reward to Thomson; and without any condition for his benefit. No undue means were used to procure the release; and it gave no benefit to Thomson, beyond that of a mere discharge from a trust, which on his part, had been faithfully performed. I am clearly of opinion, that this release is valid.

What then, is the effect of the release? It is a maxim of law, that a release to one joint debtor, is a release of the debt itself, exonerating not only the debtor to whom the release is given, but all others bound for the same debt. This ancient and strict rule of the common law, is entirely reasonable, when it is applied to an absolute release of a mere debt from divers persons. In such cases, the release is justly considered an acknowledgment by the creditor, that he has received satisfaction of the debt; and the release is conclusive in favor of all the debtors. But this rule can not be applicable to the case now before the court. The demand now in question, arises from a breach of trust; the release is not absolute, but special; the demand was not the debt of him to whom the release was given; but was due from another; and this demand, for which satisfaction has never been received, and is now sought, is

expressly reserved against the guardian, who is in law and justice, bound for its satisfaction. This release can have no artificial operation, no effect different from that really intended by the parties to the instrument. It was given in a case in which the guardians might be jointly responsible and also separately responsible to the ward; it was manifestly, given to release from a separate responsibility, and not from a joint responsibility; the demand now in question, was not a claim against Thomson to whom the release was given, but was a claim against Archibald Turner; and against him, it is expressly reserved. This instrument must have effect, according to the intentions of the parties; and it can not operate to destroy or contravene their intentions. The release is clear in its terms and meaning. It discharges Thomson, who was not responsible for the property in question; and it holds Archibald Turner liable, he having received this property and having it then in his possession, as acting guardian. It releases Thomson from all claims and demands which Miss Turner had or could claim against him. Her claim for the property now in question, was both in law and in her own contemplation, against her brother, who held her property; and that claim, she reserved. Her release to Thomson, was evidently intended, as an acquittance to one of her guardians, who had closed his own trust, to her satisfaction. It was given and taken, as the written discharge usual in similar cases, where the guardian being no longer responsible for any thing to his late ward, desires to possess and the late ward is willing to give, a formal acquittance. To construe this instrument, as exonerating all the defendants from all their responsibilities, would be a perversion of the rule of law, which exonerates joint debtors where a release is given to one of them, and would utterly subvert all the truth and justice of this case. This release therefore, has not discharged Archibald Turner from his responsibility to the complainants, for the property in question; and he is now liable for this property, as if the release had not been given.

Taylor was the surety of all the guardians. He alleges in his answer, that he executed the bond or became surety, at the particular instance of Thomson, and as surety for Thomson;

and that he did not intend to become surety for Archibald Turner or Dunlap. This allegation can not avail, to exonerate Taylor. He became surety for all the guardians; the terms of the contract, are full and explicit; and he can not destroy his engagement, by contradicting the language of his bond. He does not allege, that he executed the bond under any fraud, mistake or surprise; and he shows no reason, which can be allowed either in law or equity, to exonerate him from his contract. Taylor thus became the surety of these guardians; their surety, in compliance with the statute; the sufficient surety required by law, to be given by every guardian, that he shall in all things, faithfully discharge the *duties of his trust.* He became the surety of each and all of these guardians; answerable for the joint acts of all, where all should act jointly; and for the separate acts of each guardian, where one might act alone; responsible, that the whole trust and every part of it, should be in all things, faithfully discharged. Archibald Turner has failed to discharge his duty, as one of the guardians; and for this default, Taylor as his surety, is responsible to the complainants. Taylor is here liable by the terms of his contract; and as the release does not discharge Archibald Turner the principal, it can not discharge Taylor his surety. The release operates in respect to Taylor, as it operates in respect to all his principals. Thomson being discharged by the release, Taylor is also discharged so far as Thomson might be liable, and to no greater extent. Taylor has the full benefit of the release, so far as the release is effectual. The release can not have one construction in respect to the principals, and a different construction, in favor of the surety. When the extent of the release is ascertained, its effect must be the same, in respect both to the principals and the surety. This case has no analogy to those, in which a surety is relieved, where the principal without his assent, varies the original contract. Here, the engagement of the surety, has not been varied; and the release operates not to his detriment, but for his benefit. His responsibility has not been enlarged or prolonged, beyond the stipulations of his own contract. He is discharged from a part of his contract, by the special release, which has discharged one of

his principals, from that subject of responsibility. He is discharged from this distinct portion of his responsibility, as he is also discharged from another portion of it, by the faithful application of some parts of Miss Turner's property, to her use. But this special instrument does not exonerate Taylor from another distinct responsibility; and neither he nor the guardians, can wrest this partial release from its purpose, and convert it into a total discharge.

The property in question, belonging to the ward, has been wasted or misapplied by Archibald Turner singly, without the participation or default of the other guardians; and Thomson and the representatives of Dunlap, are not answerable for this misconduct of Archibald Turner. He and Taylor as his surety, are responsible to the complainants, for this breach of his trust. The suit as to Thomson and the representatives of Dunlap, is dismissed with costs: and between the other parties, it is referred to a master, to ascertain and report the amount, with which Archibald Turner and Taylor are chargeable, for the separate acts and defaults of Archibald Turner, as guardian.